J-S42042-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| FRANKLIN KUHN, JR. | : | |
| | : | |
| Appellant | : | No. 944 MDA 2025 |

Appeal from the PCRA Order Entered November 3, 2023
In the Court of Common Pleas of Cumberland County Criminal Division at
No(s):  CP-21-CR-0000457-2021

BEFORE:  OLSON, J., KING, J., and LANE, J.

MEMORANDUM BY LANE, J.:                **FILED: FEBRUARY 5, 2026**

Franklin Kuhn, Jr. ("Kuhn") appeals from the order denying his first petition filed pursuant to the Post Conviction Relief Act ("PCRA").[1] Additionally, Kuhn's court-appointed counsel, Kristen L. Weisenberger, Esquire, ("Attorney Weisenberger"), has filed a petition to withdraw from representation, as well as a brief styled pursuant to **Anders v. California**, 386 U.S. 738 (1967).[2] We grant Attorney Weisenberger's petition to withdraw and affirm the PCRA court's order denying Kuhn's PCRA petition.

_____

[1] **See** 42 Pa.C.S.A. §§ 9541-9546.

[2] Counsel petitioning to withdraw from PCRA representation must proceed not under **Anders** but under **Commonwealth v. Turner**, 550 A.2d 213 (Pa. Super. 1988), and **Commonwealth v. Finley**, 550 A.2d 213 (Pa. Super. 1988) (_en banc_) (collectively, "**Turner**/**Finley**").  Although **Anders** and **Turner**/**Finley** are close cousins, bearing similarities in that counsel is

_(Footnote Continued Next Page)_

In 2021, police responded to a residence in Cumberland County, Pennsylvania following a 911 call in which Kuhn reported that his wife had sustained a gunshot wound to her back when she accidentally knocked a firearm off a shelf while cleaning and it spontaneously discharged. Upon arriving at the residence, police encountered Kuhn, as well as his wife, who police observed to be lying on the floor with a gunshot wound to the back of her head. After transporting Kuhn's wife to the hospital for treatment of her injuries, police asked Kuhn if he would consent to a gunshot residue test of his hands so that they could confirm his description of events. In response, Kuhn confessed to police that he had shot his wife in the midst of an argument.[3] Consequently, police arrested Kuhn and the Commonwealth charged him with criminal attempt (criminal homicide), aggravated assault,

---

required to examine the record, present issues, and request permission to withdraw, there are also significant differences, as explained *infra*. **See** **Commonwealth v. Wrecks**, 931 A.2d 717, 721-22 (Pa. Super. 2007).

[3] During the evidentiary hearing conducted pursuant to the underlying PCRA petition, plea counsel testified that in an audio recording of the incident, Kuhn clearly "stated to [his wife,] I will kill you and yelled [']die[']" just prior to shooting her. N.T., 10/23/23, at 31. Additionally, Kuhn's wife later confirmed to police that Kuhn shot her in the midst of an argument, and as she was attempting to leave the residence. Kuhn's wife also clarified that after she fell to the ground, "Kuhn continued to come towards her . . . with the firearm again and was going to shoot her a second time[,] but [that] she [managed to fight] with him to keep the firearm pointed away from her[.]" Criminal Complaint, 1/11/21, at 6. Lastly, Kuhn's wife relayed that when "Kuhn finally stopped fighting with her as she was begging for him to call 911[, h]e delayed [making this call] for approximately ten minutes[.]" **Id**.

persons not to possess firearms, interception of wire - electronic or oral communications,[4] and recklessly endangering another person.

On April 29, 2022, Kuhn entered a negotiated guilty plea to criminal attempt (criminal homicide) and the Commonwealth agreed to *nolle prosequi* the remaining charges against him. As part of the plea agreement, the parties agreed to a sentencing recommendation of fifteen to thirty years' incarceration. Relevantly, in entering this negotiated guilty plea, Kuhn signed and executed a written plea colloquy wherein he acknowledged that he entered the plea voluntarily, knowingly, and intelligently. Additionally, Kuhn orally confirmed his execution and understanding of the terms of the written plea colloquy and the consequences of his plea in an oral plea colloquy before the trial court, as follows:

> [Trial Court]: Before we go any further, [Kuhn], since -- so this makes sense [of] what we were discussing [in regards to your sentencing], the Commonwealth is making a recommendation in your case. That means I can wait for the Commonwealth's recommendation, but ultimately sentencing is at my discretion. Do you understand that?
>
> [Kuhn]: Yes, ma'am.
>
> [Trial Court]: So[,] we can move forward then with the facts.

---

[4] This charge stemmed from the fact that, prior to the shooting, Kuhn had been recording his wife on multiple occasions while she was alone within the residence. We note that the discovery of this fact by Kuhn's wife immediately preceded the underlying argument, as well as her attempt to leave the residence.

[Prosecutor]: Your Honor, on or about January 7th, 2021 in the area of 123 East Shady Lane in Enola, [Kuhn] did shoot the victim causing serious bodily injury, risking her death.

[Trial Court]: And the victim was?

* * * *

[Prosecutor]: The victim was . . . his wife at the time. The gunshot wound was, I believe, to the head.

[Trial Court] And do we know her injuries?

[Prosecutor]: She does have some injuries, Your Honor. I do not have an updated medical for her, but I know that there was – there has been some – a lot of medical treatment since the incident.

[Trial Court]: And then there will also be resulting restitution.

* * * *

[Trial Court]: So[,] Kuhn did you hear what the District Attorney said that you did?

[Kuhn]: Yes, ma'am.

Q. Is that what you did?

A. Yes, ma'am.

Q. And[,] you understand that that makes out the crime of criminal attempt to homicide?

A. Yes, ma'am.

Q. Felony in the first degree?

A. Yes, ma'am.

Q. You also understand that by pleading guilty, you're giving up your right to have a trial and contest the charges?

A. Yes, ma'am.

- 4 -

Q. Do you understand if you did have that trial, the Commonwealth would have the burden of proving you guilty beyond a reasonable doubt?

A. Yes, ma'am.

Q. Have you had sufficient time to discuss your case with [your attorney]?

A. Yes, ma'am.

Q. And[,] you've reviewed these rights with her that you're giving up by pleading guilty?

A. Yes, ma'am.

Q. Any questions about these rights?

A. No.

Q. And you are on probation or parole. I take it your probation officer is aware of these charges?

A. Yes, ma'am.

* * * *

[Trial Court]: Were any threats or promises made to make you plead guilty?

[Kuhn]: No, ma'am.

Q. And[,] we already discussed the Commonwealth is recommending [fifteen] to [thirty] years' sentence?

A. Yes, ma'am.

Q. And do you agree to make restitution once that's determined?

A. Yes, ma'am.

Q. Any questions at all about what you're doing?

A. No, ma'am.

Q. Considering all of that, how do you wish to plead to the charge of criminal attempt at homicide, a felony in the first degree?

A. Guilty.

N.T., 4/28/22, at 3-6 (unnecessary capitalization omitted). As a result of these colloquies, the trial court accepted Kuhn's guilty plea, and deferred sentencing for the preparation of a presentence investigation report.

On June 23, 2022, the trial court imposed the recommended sentence of fifteen to thirty years' incarceration. Kuhn did not file a post-sentence motion, nor did he file a direct appeal from his judgment of sentence.

On June 7, 2023, Kuhn filed a timely *pro se* PCRA petition alleging, *inter alia*, that: (1) his plea counsel, Arla Waller, Esquire ("Attorney Waller"), was ineffective "throughout all stages of [the] criminal proceedings[;]" and (2) he did not enter his guilty plea voluntarily, knowingly, and intelligently, as the guilty plea colloquy failed to "explain[] what attempt[ed] murder in the first degree meant and its consequences." *Pro Se* PCRA Petition, 6/7/23, at 4 (unnecessary capitalization omitted). Within this petition, Kuhn additionally averred that "no appeals w[]ere filed on [his] behalf because [his] court[-]appointed attorney failed to communicate with [him]." ***Id***. at 5. In response to this filing, the PCRA court appointed counsel, William G. Braught, Esquire, ("Attorney Braught"), who in-turn filed an amended petition incorporating these issues. The PCRA court then held an evidentiary hearing on the matter, during which it heard testimony from both Kuhn and Attorney Waller. We

provide the relevant portions of this testimony, beginning with that provided

by Kuhn, as follows:

[PCRA Counsel]: The conversation that you had with Attorney Waller prior to you entering the plea, tell us about that conversation. What did [Attorney Waller] explain to you about the plea that she had discussed with the District Attorney?

[Kuhn]: Well, when I came into the room . . . she was explaining . . . that they would not go down from [fifteen] to [thirty]. It was [fifteen] to [thirty] or go to trial. I asked -- well, you know, I said to her well, can't we go seven and a half to [fifteen], [ten] to [twenty]? She said no, they're not going to drop from it at all. She said basically just take it.

Q. Did she explain to you what charge or charges you would be entering a plea to?

A. Yeah. She said attempted murder, but she didn't explain that it was first degree. It was a first degree, you know, charge.

Q. What, if anything, did she explain to you as to what the crime of attempted murder meant?

A. She meant that -- if I remember correctly[,] she didn't really explain what the -- how they came to that, you know, attempted murder. It was just basically she told me what the time would be, [fifteen] to [thirty]. She said -- I asked her, I said ma'am, what should I do and she said I would take the plea. She said they're cutting time off from what it should be. I don't know -- you know, I never understood the point system. I never understood how that works, and nothing was ever explained other than the [fifteen] to [thirty].

Q. Based upon that conversation with Attorney Waller, at that point did you decide to go forward with entering a plea for that . . . sentence?

A. Yes, sir.

* * * *

Q. When you entered the plea, do you recall if either any of the attorneys or if the judge explained to you what are called the elements of the crime or what it meant to be entering a plea to attempted murder?

A. Yeah.  The judge, she explained it, but yeah, at the same time they were confused about how many months and what the fine was, and they were going back and forth over that.

Q. But did you -- at the time that you agreed to enter the plea and actually entered the plea, did you have an understanding what specifically the crime of attempt[] to commit criminal homicide meant?

A. No, sir.

* * * *

Q. By either Attorney Waller or the court or anyone else, was it ever explained to you that attempt to commit criminal homicide meant that you did an act with the intent to commit the specific crime of homicide?  In other words, you intended to kill the person?

A. No.  That was never explained to me, sir.

Q. And[,] was it not until you got to [State Correctional Institute] Smithfield that you began to have some understanding that that's what was meant when you entered a plea to that charge . . .?

A. Yes, sir.  Yes, sir.  I was at Smithfield then I realized what the actual charge meant, you know, with the first degree on it.

Q. Had you understood that the elements of the charge of attempt to commit criminal homicide meant that you were intending to commit the specific crime of homicide -- in other words, to kill someone -- would you have entered a guilty plea to that charge?

A. No.  I would have asked for a jury trial.

N.T., 10/23/23, at 9-13 (unnecessary capitalization omitted).

- 8 -

We now provide the relevant portions of testimony provided by Attorney Waller, as follows:

[PCRA Counsel]: How are you employed, [Attorney] Waller?

[Attorney Waller]: I'm an attorney at the Cumberland County Public Defender Office.

Q. How long have you been employed there?

A. Since 1991.

Q. So[,] I take it that your primary and maybe sole area of practice is criminal defense?

A. Yes.

* * * *

Q. From the time of his preliminary hearing up through the time that he entered the plea, did you have an opportunity to see . . . Kuhn in person at Dauphin County Prison?

A. No.

Q. Was that based upon COVID restrictions or other issues?

A. It was COVID.  Dauphin County was worse than Cumberland County, so there were no -- I didn't go to see anyone in person during that time.

Q. Did you have -- again, prior to the entry of his guilty plea on April 28th of 2022, were you able to arrange either video or telephone conferences/meetings with . . . Kuhn?

A. Telephone.

Q. . . . Kuhn testified that he recalled having two approximate [fifteen]-minute phone conversations with you about his case.  Do you recall whether that's – is that your recollection or was it less or more or?

* * * *

A. I can't remember if it was two separate occasions or if it was one occasion because they did [fifteen]-minute block calls and so if you needed to speak to someone for more than [fifteen] minutes, you would let them know that in the e-mail. So[,] it could have either been two occasions for [fifteen] minutes or it could have been one occasion for two [fifteen]-minute blocks.

Q. So[,] it could have been essentially a [thirty]-minute conversation on one day or two different days of a [fifteen]-minute conversation each?

A. Correct.

Q. But not more than that is your recollection?

A. Correct. . . ..

Q. Whether it was one occasion or two occasions, do you recall when those communications would have been in relation to the entry of the guilty plea? Was it days before, weeks before, months before?

A. Oh, it was -- it wasn't days or weeks before. It would have been a couple months before. I don't remember the exact date.

Q. During [these] meetings, were any conversations held about plea negotiations or plea conversations you were having with the Commonwealth regarding this case?

A. I told him there had not been an official offer made by the [Commonwealth]. We discussed some stuff about his case, and I did ask him, you know, how do you see this going? What would you like to see happen? And he wanted a shorter term than he obviously received, and he did not want to plea to attempted murder.

Q. [D]o you recall having any conversations with him about what the elements or what it would mean if he were to enter a plea to attempted murder?

A. I did let him know that it was attempted homicide, that it was a felony of the first degree. As charged on the information, it has

a maximum of [twenty] years, but because of the nature of the injuries, the maximum is increased to [forty] years.

Q. And . . . during those phone conversations was there any explanation from you that that charge of attempt to commit homicide meant that he would be admitting [he] had the intent to kill someone . . .?

A. That and also that the attempt means they took a substantial step towards [the commission of criminal homicide].

* * * *

Q. Do you recall whether you covered the part about what the intent was when the charge was attempt? In other words, that it wasn't to just hurt the person or scare the person, that it was to kill the person?

A. Yes.

Q. And did you explain that to him?

A. Yes. That was one of the reasons he said he did not want to plead to the attempted murder.

* * * *

Q. So[,] the next time that you did actually speak with [Kuhn] would have been the morning prior to the entry of the plea?

A. Right.

Q. The conversation that you had with him then, how long was that -- I assume that was in a private room somewhere at the Cumberland County Prison?

A. Yes. As . . . Kuhn testified to, it was in the small conference rooms they have right off the main hall or in the main hallway there.

Q. Tell us about that conversation. What did you explain to him about plea offers at that point in time?

A. I let him know what the offer . . . was at the time. I told him that I had had discussions with the DA about an alternative plea instead of the attempted murder, and the DA would not do that based on the conversation I had had with . . . Kuhn previously; and I also had talked to them about reduction in time for the charge that he did plead to, and the DA was not willing to do that because of her injuries. He was not willing to do that.

Q. [A]t that point in time when you were meeting with him in private, did you have more conversation[s] with him about essentially the elements again of the charge of criminal attempt to commit homicide [such that] it would mean that he had the intent . . . to kill the person?

A. I reviewed the guilty plea form with him, and one of the questions on there is whether or not they understand the elements of the offense; and so I asked him that based on our previous conversations if he understood that[,] and he said yes. So he filled out the form.

Q. So[, y]ou basically referenced that we discussed the elements in one of our phone calls previously, and [said] do you understand what we discussed about those elements at this time?

A. Correct.

Q. But[,] you did not re-explain the elements at that time?

A. I would have if he didn't understand them.

Q. But[,] since he . . . said he did understand them, you did not re-explain them at that time?

A. Correct.

Q. At the end of your private conversation with . . . Kuhn[,] did he make a decision about whether he wanted to go forward with the plea to the criminal attempt to commit homicide?

A. He did.

Q. And did you end up representing him and standing next to him when he entered that plea before [the trial court]?

A. I did.

[PCRA Court]: And was part of the reason [that Kuhn decided to enter the plea] because it was a mitigated offer?

[Attorney Waller]: Yes, and [during the] discussions with . . . Kuhn the day of the plea, he acknowledged that if he went to trial, he could get a worse penalty . . . even if he was acquitted of the attempted homicide, . . . he could still [get a worse sentence given that] if [he were to be convicted on the other charges, and they] didn't merge, he could get worse time.  And[,] Kuhn himself even said I should take this because if I go to trial, they're going to, you know, hammer me.

[PCRA Counsel]: Ultimately, at the end of your conversation in private with . . . Kuhn did you advise him whether you thought he should take this plea to criminal attempt to commit homicide for the [fifteen to thirty]-year sentence?

[Attorney Waller]: When . . . Kuhn said I should take this plea because I could get worse if I went to trial, I told him that that is a true statement that he could get worse if he went to trial.

* * * *

[Prosecutor]: So[,] is it true through the course of . . . the case you, yourself, looked over what evidence would be presented against [Kuhn] at trial?

[Attorney Waller]: Yes.

Q. And are you familiar that [Kuhn] was on scene when the police arrived and acknowledged that he had, in fact, shot the victim?

A. Yes.

Q. And were you familiar with the audio and video recording recovered by the police that would have substantiated the wiretap charge he was facing?

A. Yes.

- 13 -

Q. And in that particular recording, was it evident that [Kuhn] had, in fact, stated to the victim I will kill you and yelled [']die['] while racking the shotgun?

A. Yes.

Q. And that could be clearly heard on the audio?

A. Yes.

Q. And through the course of the police investigation, didn't he, in fact, acknowledge shooting the victim in a vital part of her body?

A. He did make a statement to police admitting his involvement in the shooting.  He did.

Q. Are those all factors that you considered when advising him how strong the case would be for the Commonwealth at trial?

A. Yes.

* * * *

Q. [B]ased on your conversations with [Kuhn], he seemed to understand that he was looking at significant jail time even if at trial he wasn't convicted of the attempted homicide?

A. Yes.  He acknowledged that as late as the date we entered the plea.

* * * *

Q. And . . . you went over all of the written [colloquy] paperwork with [Kuhn]?

A. Yes.

Q. And I believe you indicated to . . . PCRA counsel that when reviewing that, he didn't ask any questions about the elements of the crime?

A. Correct.

Q. And he indicated he understood exactly what he was pleading to?

A. Yes.

[PCRA Court]: You went over with him the guidelines on each of the charges, right?

[Attorney Waller]: Yeah.

＊ ＊ ＊ ＊

[Prosecutor]: [A]t the time you had this case, would you have had access to the sentencing guidelines and [Kuhn's] criminal history?

[Attorney Waller]: Yes.  And[,] then with the attempted homicide carrying a [forty]-year max, then what the guidelines were, I went over that with him and said that the [fifteen] years was actually mitigated based on those guidelines.

＊ ＊ ＊ ＊

Q. And[,] do you recall being in court with [Kuhn] at the time of the sentencing on this case?

A. Yes.

Q. At that point in time, did [he] tell you he wanted to withdraw his guilty plea or had any issue with the fact that he had entered a plea in this manner negotiated?

A. No.

Q. If he had raised those concerns, would you have let the judge know at that point in time?

A. I would have let the judge know and then did as [she] directed. . . ..

*Id*. at 19-20, 22-36 (unnecessary capitalization omitted).  On November 3, 2023, the PCRA court denied Kuhn's petition.  Kuhn did not appeal from the denial of his petition.

On April 28, 2025, Kuhn filed another *pro se* PCRA petition in which he alleged that his prior PCRA counsel, Attorney Braught, was ineffective for failing to file an appeal from the denial of his first PCRA petition, as directed. Specifically, Kuhn asserted that although he sent Attorney Braught a letter indicating that he wanted to appeal from the PCRA court's denial order, he recently learned from this Court that Attorney Braught never filed an appeal. In response to this petition, the PCRA court appointed Attorney Weisenberger as counsel, who in-turn filed a petition to withdraw on the basis that Kuhn's petition was untimely. The PCRA court thereafter denied this withdrawal petition, reasoning that it needed to conduct an evidentiary hearing to determine "the questions of whether [Kuhn] requested [Attorney Braught] to file a timely direct appeal from the . . . denial of his first PCRA petition, and whether [Kuhn] was abandoned by [Attorney Braught.]" Order, 5/30/25, at 1.

On July 3, 2025, following the aforementioned evidentiary hearing, the PCRA court reinstated Kuhn's appellate rights from the order denying his first PCRA petition, *nunc pro tunc*. Kuhn then filed a timely, counseled notice of appeal via Attorney Weisenberger, who continued on as his appointed counsel in this matter, and the PCRA court ordered Kuhn to file a concise statement pursuant to Pa.R.A.P. 1925(b). However, in lieu of filing said concise statement, Attorney Weisenberger instead filed in this Court another petition

to withdraw from representation, as well as a brief styled pursuant to *Anders*, 386 U.S. at 738.

At the outset of our review, we note that this case does not implicate *Anders*. As explained above, *Anders* applies to direct appeals, whereas *Turner*/*Finley* applies to PCRA cases. This Court has explained the differences between the requirements imposed by *Anders* and *Turner*/*Finley* as follows:

> *Anders* counsel is not permitted to withdraw unless the appeal is wholly frivolous, but *Turner*/*Finley* counsel is permitted to do so if the case lacks merit, even if it is not so anemic as to be deemed wholly frivolous. Also, *Anders* counsel must not argue against the client's interests while *Turner*/*Finley* counsel must do so, articulating why the client's claims have no merit.

> The heightened protection afforded to *Anders* appellants as compared to *Turner*/*Finley* petitioners/appellants arises because the right to counsel on direct appeal and the right to the direct appeal itself are constitutional ones. By comparison, a first-time PCRA petitioner's right to counsel is born of rule, namely Pa.R.Crim.P. 904(C), and that right does not spring from the federal or state constitutions.

*Wrecks*, 931 A.2d at 722 (citations omitted). "Because an *Anders* brief provides greater protection to a defendant, this Court may accept an *Anders* brief in lieu of a *Turner*/*Finley* letter." *Commonwealth v. Widgins*, 29 A.3d 816, 817 n.2 (Pa. Super. 2011).

Pursuant to *Turner*/*Finley*, independent review of the record by competent counsel is required before withdrawal on collateral appeal is permitted. *See Commonwealth v. Pitts*, 981 A.2d 875, 876 n.1. (Pa. 2009).

- 17 -

In **Pitts**, our Supreme Court explained that such independent review requires proof of:

(1)    A "no-merit" letter by PC[R]A counsel detailing the nature and extent of [counsel's] review;

(2)    The "no-merit" letter by PC[R]A counsel listing each issue the petitioner wished to have reviewed;

(3)    The PC[R]A counsel's "explanation," in the "no-merit" letter, of why the petitioner's issues were meritless;

(4)    The PC[R]A court conducting its own independent review of the record; and

(5)    The PC[R]A court agreeing with counsel that the petition was meritless.

**Id**. (citation and brackets omitted).  Further, counsel must also send a copy of the "no-merit" letter to the petitioner, along with a copy of the petition to withdraw and inform the petitioner of the right to proceed *pro se* or to retain new counsel.  **See Wrecks**, 931 A.2d at 721.  Substantial compliance with the requirements to withdraw as counsel will satisfy the **Turner**/**Finley** criteria.  **See Commonwealth v. Karanicolas**, 836 A.2d 940, 947 (Pa. Super. 2003).  If the brief meets these requirements, we then conduct an independent review of the petitioner's issue(s).  **See Commonwealth v. Muzzy**, 141 A.3d 509, 511 (Pa. Super. 2016).

Preliminarily, our review discloses that Attorney Weisenberger has substantially complied with the above requirements.  In her petition to withdraw, Attorney Weisenberger detailed the nature and extent of her review of Kuhn's case, listed the issue that he wished to have reviewed, and explained

- 18 -

her reasoning for concluding that the issue is meritless. Additionally, Attorney Weisenberger provided Kuhn with a letter notifying him of her intention to seek permission to withdraw from representation as well as a copy of the **Anders** brief, and advised Kuhn of his rights in lieu of court-appointed representation. Thus, we conclude that Attorney Weisenberger has substantially complied with the requirements necessary to withdraw as counsel. **See Karanicolas**, 836 A.2d at 947.

We now independently review the issue that Kuhn wished to raise on appeal to ascertain whether he is entitled to relief. In her brief, Attorney Weisenberger framed the issue as follows: "Whether the [PCRA] court erred [by denying Kuhn's] PCRA petition where [he] presented claims of ineffective assistance of counsel in that his plea was not knowing, voluntary, and intelligent." **Anders** Brief, 9/22/25, at 4.

Our standard of review of an order denying a PCRA petition is well-settled:

> We review an order [denying] a petition under the PCRA in the light most favorable to the prevailing party at the PCRA level. This review is limited to the findings of the PCRA court and the evidence of record. We will not disturb a PCRA court's ruling if it is supported by evidence of record and is free of legal error. This Court may affirm a PCRA court's decision on any grounds if the record supports it. Further, we grant great deference to the factual findings of the PCRA court and will not disturb those findings unless they have no support in the record. However, we afford no such deference to its legal conclusions. Where the petitioner raises questions of law, our standard of review is *de novo* and our scope of review plenary.

*Commonwealth v. Ford*, 44 A.3d 1190, 1194 (Pa. Super. 2012) (citations omitted).

Kuhn's sole issue on appeal concerns whether his trial counsel rendered ineffective assistance. In assessing a claim of ineffective assistance under the PCRA, we presume that counsel has rendered effective assistance. *See Commonwealth v. Reid*, 259 A.3d 395, 405 (Pa. 2021). To overcome the presumption, the petitioner must show that:

> (1) the underlying substantive claim has arguable merit; (2) counsel did not have a reasonable basis for his or her act or omission; and (3) the petitioner suffered prejudice as a result of counsel's deficient performance, that is, a reasonable probability that but for counsel's act or omission, the outcome of the proceeding would have been different.

*Id*. (citation and quotation marks omitted). The defendant must satisfy all three prongs of this test to obtain relief under the PCRA. *See id*. Accordingly, the failure to satisfy any one of these prongs will result in the rejection of the petitioner's ineffectiveness claim. *See id*.

In assessing claims of ineffective assistance of counsel in relation to the validity of a defendant's guilty plea, this Court has instructed as follows:

> A criminal defendant's right to effective counsel extends to the plea process. Under the PCRA, allegations of ineffectiveness in connection with the entry of a guilty plea will serve as a basis for relief only if the ineffectiveness caused the petitioner to enter an involuntary or unknowing plea. Where the defendant enters his plea on the advice of counsel, the voluntariness of the plea depends on whether counsel's advice was within the range of competence demanded of attorneys in criminal cases.
>
> To establish prejudice, the defendant must show that there is a reasonable probability that, but for counsel's errors, he would not

- 20 -

have pleaded guilty and would have insisted on going to trial. This is not a stringent requirement. The reasonable probability test refers to a probability sufficient to undermine confidence in the outcome.

*Commonwealth v. Brown*, 235 A.3d 387, 391 (Pa. Super. 2020) (citations, quotation marks, and brackets omitted). Additionally, "[a] defendant is bound by the statements made during the plea colloquy, and a defendant may not later offer reasons for withdrawing the plea that contradict statements made when he pled." *Commonwealth v. Brown*, 48 A.3d 1275, 1277 (Pa. Super. 2012) (citation omitted).

In the *Anders* brief, Attorney Weisenberger summarized Kuhn's argument to the extent that he "allege[d] that his plea was not knowing, voluntary and intelligent[,]" given his testimony "at the PCRA hearing that he did not understand what criminal attempt homicide meant and he would not have plead guilty to that offense because he was not guilty." *Anders* Brief, 9/22/25, at 14, 19. In addressing this argument, Attorney Weisenberger concluded that it was without merit, as: (1) Kuhn admitted to police that he shot his wife; (2) he verbally acknowledged at the plea hearing that "he understood his rights and the rights he gives up upon pleading guilty" and that "no one threatened or forced him into entering the plea[;]" (3) he "signed and submitted a guilty plea colloquy form which advised [him] of his trial rights and the rights he would give up by pleading guilty[;]" and (4) during the evidentiary hearing on this matter, his trial counsel testified that she "advised [him] of the terms of the plea agreement" in relation to "the nature

- 21 -

of the charges" against him as well as the standard sentencing range that would accompany a possible guilty verdict at trial. *Id*. at 16, 18-19.

In denying Kuhn's PCRA petition, the PCRA court generally relied upon this same reasoning, elaborating as follows:

> Relevant to the instant case, [Kuhn] was charged with one count of criminal attempt – criminal homicide, with a statutory maximum term of incarceration of [forty] years. However, the plea agreement recommended a sentence of [fifteen] to [thirty] years of incarceration, and ultimately this court adopted that recommendation. During the guilty plea colloquy, the Commonwealth stated the facts supporting the charge of criminal attempt – criminal homicide. [Kuhn] signed a written guilty plea colloquy form and answered all of this court's verbal questions during his plea colloquy, including understanding his waiver of trial rights. During the verbal plea colloquy, the Commonwealth set forth the facts of the record that supported the charge, and [Kuhn] agreed that he had taken those actions, and that those facts made out the offense of criminal attempt – criminal homicide. At this time, this court discussed with [Kuhn] the charge that he was pleading to, the facts supporting that charge, that he had a right to a trial by jury, and the range of potential sentences and fines that he faced. [Kuhn] confirmed that he had enough time to discuss the plea with his attorney. The record demonstrates that this court ensured that the plea was knowing, intelligent and voluntary, thereby ensuring that it was a valid plea.
>
> * * * *
>
> Accordingly, under the [ineffective assistance of counsel] test[, Kuhn] fails the first prong by not presenting a legal claim with underlying merit. Specifically, the record contains both a written plea colloquy and an oral plea colloquy completed by [Kuhn]. Taken together, the oral and written colloquies establish all six of the factors that must be understood by a defendant at the time of the plea. Because [Kuhn] affirmatively stated orally in open court, and in writing in his written colloquy, that he understood those factors, he cannot now recant his prior statements to argue that his plea was unknowing, unintelligent, and involuntary. Regarding the second prong of the [ineffectiveness] test, because [Kuhn] entered a valid guilty plea,

- 22 -

there was no action or inaction of counsel that could lack a reasonable basis, so [Kuhn] must fail this prong as well. Finally, [Kuhn] failed to demonstrate the existence of prejudice due to ineffective assistance of counsel; because [he] entered a knowing, intelligent and voluntary guilty plea, which resulted in his receiving a sentence below the mitigated range of the sentencing guidelines, he was not prejudiced. Therefore [Kuhn's] claim based on ineffective assistance of counsel will be denied.

Order, 11/3/23, at 7-9 (citations, footnotes, and unnecessary capitalization omitted).[5]

After reviewing the record in the light most favorable to the Commonwealth as the verdict winner, we discern no error or abuse of discretion by the PCRA court in reaching its determination that Kuhn's ineffectiveness claim was without merit. Instantly, we reiterate that for Kuhn to succeed on his claim of ineffective assistance of counsel, he needed to prove that his challenge to the validity of his guilty plea had arguable merit. **See Reid**, 259 A.3d at 405. As both Attorney Wiesenberger and the PCRA court make abundantly clear, however, Kuhn separately submitted both a written and oral guilty plea colloquy in which he voluntarily, knowingly, and intelligently admitted to committing the crime of attempted homicide by shooting his wife in the back of her head.

As it specifically pertains to Kuhn's understanding of the written guilty plea colloquy, Attorney Waller testified that she was present when Kuhn filled

---

[5] In its Rule 1925(a) opinion, the PCRA court incorporated by reference the above analysis, as included in its November 3, 2023 denial order.

out the written colloquy form, and that she informed him of: (1) the elements of the crime of attempted homicide, to the extent that a plea of guilty would mean him "admitting [that he] had the intent to kill" his wife and that he "took a substantial step towards" doing so; (2) the fact that this crime constitutes a first-degree felony, and as applied to him, carries a maximum of forty years' imprisonment; (3) the terms of the Commonwealth's plea offer and the fact that its recommended sentence of fifteen to thirty years' imprisonment was below the standard sentencing range for the crime; and (4) the possibility that he could get a worse sentence at trial even if a jury were to acquit him of the attempted homicide charge, as he was facing multiple other charges that would not have merged for sentencing purposes. N.T., 10/23/23, at 25-26. Attorney Waller further emphasized that in response to this counsel, Kuhn indicated to her that he understood the elements of attempted homicide, acknowledged "that if he went to trial, he could get a worse penalty[,]" and confirmed that he "should take this [plea] because if [he were to] go to trial, they're going to, you know, hammer [him]." *Id*. at 29-30.

Moreover, following the submission of the above-detailed written guilty plea colloquy, Kuhn again orally confirmed his understanding of the plea process. Specifically, he once more: (1) conceded that he committed the crime of attempted homicide; (2) acknowledged that the crime constituted a "[f]elony in the first degree[,]" and that "by pleading guilty, [he was] giving up [his] right to have a trial and contest the charges[;]" (3) submitted that

he "had sufficient time to discuss [the] case with" Attorney Waller and that he had no questions regarding the rights he was forfeiting by entering the instant guilty plea; and (4) confirmed that his guilty plea was voluntary and that he understood the Commonwealth would be recommending a sentence of fifteen to thirty years' imprisonment. N.T., 4/28/22, at 3-6. As it pertains to the nature of this testimony, Attorney Waller additionally clarified that Kuhn did not indicate to her at any point during the oral colloquy that "he wanted to withdraw his guilty plea or [that he] had any issue with the fact that he had entered" the plea as she negotiated. N.T., 10/23/23, at 36.

On this record, we observe that Kuhn's arguments, as they pertain to his challenge to the validity of his guilty plea, clearly contradict the sworn statements that he submitted to the trial court in both his written and oral guilty plea colloquies. As such, his challenge in this regard is meritless. **See Brown**, 48 A.3d at 1277. Consequently, because we determine that Kuhn's underlying claim lacks arguable merit, we conclude that he necessarily fails to overcome the presumption that Attorney Waller provided him with effective assistance as counsel. **See Reid**, 259 A.3d at 405. Thus, we hold Kuhn's sole issue is without merit, and we affirm the PCRA court's order denying his petition.

Petition to withdraw granted. Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 2/5/2026